### WAGUESPACK v. PLAYLAND CORPORATION et al.

### No. 16984.

Court of Appeal of Louisiana. Orleans.
April 22, 1940.

W. J. Waguespack, of New Orleans (Rene Waguespack, of New Orleans, of counsel), for appellant.

Porteous, Johnson & Humphrey, of New Orleans, for appellees.

McCALEB, Judge.

The plaintiff, Mildred J. Waguespack, brought this suit against the Playland Corporation and its public liability insurance carrier, Associated Indemnity Corporation, for the recovery of damages for personal injuries sustained by her while riding on a pleasure device known as a "Loop-O-Plane" which is operated by the first named defendant at the amusement park known as Pontchartrain Beach located in the City of New Orleans. She alleges, in substance, that, on May 5, 1937, at about ten p. m., she paid to the defendant, Playland Corporation, its stipulated price to enter and ride upon the Loop-O-Plane machine; that the operator of the machine pointed out to her a car or basket in which she should ride but that he failed and neglected to warn her that there was any danger connected with riding upon the device; that, on the contrary, he held out and represented that the Loop-O-Plane was perfectly safe and was to be properly operated; that there were no warning signs or notices displayed by the defendants in reference to the operation of the Loop-O-Plane notwithstanding that the defendants had, or should have had, knowledge that the device was dangerous; that, immediately prior to her entering the basket or car of the machine, one of her friends, who was to accompany her on the ride, requested the operator of the Loop-O-Plane to be careful since the plaintiff had never ridden in the device before and that the said operator retorted that he would run the machine in such a manner as to frighten the plaintiff. She further avers that, after she had entered the basket assigned to her, the Loop-O-Plane started suddenly and without warning; that the basket swung swiftly and suddenly in an upward direction and, upon reaching a point somewhat above a horizontal line to the ground, came to a violent and jerky stop and then plunged downward in the direction from which it had come; that, while said basket was being so operated and just at the time it came to the violent and jerky stop, her head, as the result of such operation, was jerked and snapped so violently that she sustained a fracture of the second cervical vertebrae; that, as soon as she felt her neck snap and crack, she began to scream loudly for the operator to stop the Loop-O-Plane but that, notwithstanding her remonstrances, he paid no attention whatsoever and continued to run the machine in such a manner as to cause her head to be further jerked and snapped violently back and forth causing her great pain and suffering. She further alleges that, as a result of the accident, she suffered excruciating physical and mental pain; that it was necessary for her neck to be encased in a device known as a "Thomas Collar" made of aluminum and leather for a long period of time and that she is entitled to recover damages from the defendants in the sum of $25,353.50.

The defendants, in their answer, admit the happening of the accident but deny any and all liability to the plaintiff for the consequences thereof. They specifically disclaim any negligence on the part of the operator of the Loop-O-Plane and set forth that the device was in excellent mechanical condition; that it was operated by a competent mechanic; that it had been purchased from a leading manufacturer of such devices, namely, Eyerly Air Craft Corporation; that it was equipped with all usual appliances and that it was without structural or mechanical defect. They further declared that the Loop-O-Plane

had been in use for a long time prior to the accident and has been in use since then; that a large number of persons had ridden on the device without injury; that no accident has ever happened before and that there was no reason for them to anticipate that any accident, such as the one suffered by plaintiff, would occur.

After a hearing in the court below on the foregoing issues, the district judge, being of the opinion that the defendants were free from fault, dismissed plaintiff's suit. She has appealed.

The evidence submitted by plaintiff at the trial below in support of the allegations of her petition is, in substance, as follows: On May 5, 1937, the plaintiff, in company with her sister, Miss May Waguespack, her brother-in-law and sister, Mr. and Mrs. Leo D. Couvillion, and two friends, Miss Geraldine Sterken and Miss Eunice Simon, went to Pontchartrain Beach on an outing and while there they decided to take a ride on the device known as the Loop-O-Plane.

The Loop-O-Plane may be described to be in the nature of a dual swing or pendulum which is operated by a small $7\frac{1}{2}$ horse power electric motor. In operating the device, passengers are seated and strapped in baskets or cars which are attached to the end of the pendulums. The operator then throws a single switch which starts the cars in motion but, due to the low horse power of the electric motor, the cars do not start quickly and travel a short distance only on the first upward swing. On this first swing, the motor carries the cars as high as its power will permit which is usually about one-third of the distance from a vertical position of the pendulums to the horizontal. When the maximum height is attained from this motion, the pendulums gradually slow down to a complete stop. At this point, the operator of the machine reverses the action of the motor, throwing the switch to the opposite side and thereupon the cars start down on the reverse swing. Due to the additional momentum obtained by the first swing, the second swing raises the cars considerably higher on the opposite side where they again gradually slow down due to the lack of power of the motor to swing them completely over the top. At that time the switch is again thrown by the operator and the procedure reversed. After about ten or twelve swings, the cars attain such a momentum that they are finally able to swing over the top of the device and thus make a complete loop or circle.

Plaintiff testified that, when she went into the Loop-O-Plane, it started off rather smoothly but that when it reached the top of the first swing, there was a terrific jolt and that, as a result, her neck jerked and cracked. She further states that, during the successive swings of the cars, there was considerable jolting but that none of the subsequent jolts was as severe as the first one.

Mr. Couvillion, plaintiff's brother-in-law, who was riding in the same car with her, stated that there was a severe jerk when the car reached its maximum height on the first swing. In fact, this witness, in describing the sensation he felt, says that the jerk was so extraordinary that "it liked to snapped my neck off". He further asserted that he and plaintiff's sister, Miss May Waguespack, had ridden on the Loop-O-Plane just previous to the ride during which the accident occurred and that, on the first occasion, the device was operated smoothly and there were no unusual jerks.

Mrs. Couvillion, plaintiff's sister, who also rode in the same car with plaintiff, stated that there was a severe jerk when the car stopped at the top of the loop and that, while there were other jerks, the one at the top was the most severe.

Plaintiff's other sister, Miss May Waguespack, stated that she and Mr. Couvillion rode on the Loop-O-Plane just previous to the accident and that the ride was very smooth but that, on the second ride, there was a terrific jerk when the car made its first swing.

Miss Geraldine Sterken and Miss Eunice Simon, friends of the plaintiff, who occupied the other car of the Loop-O-Plane during the ride, stated generally that there were violent jolts while the device was in operation. Miss Sterken says that the ride started off smoothly and that there was a violent jerk of the car on the first swing upward. On the other hand, Miss Simon says that the jolt did not occur on the first swing; that the ride started smoothly and that, when the car was about to make the loop, it jerked violently.

In contrast to the testimony submitted by the plaintiff, the defendants produced evidence to the effect that the Loop-O-Plane is structurally designed and con-

structed in such a fashion so as to make it impossible for the passengers to receive violent jolts during its operation.

Mr. Wagnon, the operator of the device, stated, in substance, that he was employed by the defendant Playland Corporation as assistant maintenance man; that the Loop-O-Plane was regularly inspected every day by a Mr. Kramer and himself; that the machine had always been in good order and condition; that he had operated it for approximately two years, handling an average of over a hundred persons per day and that no one had ever complained of the manner in which the machine was run. He further declared that, because of the small motor employed in the operation of the device, it is impossible for the operator to cause any unusual jerk of the cars during the course of the ride and that, while there is a brake which is used for stopping the cars, it is so small that its application cannot cause any unusual or sudden jolts. Mr. Frank L. Kramer, the chief maintenance man at Pontchartrain Beach fully corroborates the statement of Mr. Wagnon and he explains in detail in his testimony the manner in which the Loop-O-Plane is operated.

Mr. H. L. McLean, an engineer, testified that he made an examination of the Loop-O-Plane at the request of the defendants; that he operated it himself; that it was impossible to produce any unusual jars or jolts to the cars even if the operator actually attempts to do so. He further stated that the machine operates in a uniform way; that the electric motor is of very small horse power and that the small brake, which is provided, has only about ten per cent of the power of an ordinary automobile brake.

Mr. Harry J. Batt, manager of Pontchartrain Beach, corroborates the testimony of the other witnesses for the defendants as to the manner in which the Loop-O-Plane operates. He further states that nothing was found wrong with the device either on the night of the accident or since that time; that the machine is very popular and that as many as 4,000 people have ridden upon it in one day.

The evidence given by the foregoing witnesses is further supported by the deposition of Mr. Lee U. Eyerly, the President of Eyerly Air Craft Corporation, the manufacturer of the Loop-O-Plane. He states, in substance, that the best engineering skill attainable has been utilized in building the device structurally free from any mechanical failure which might develop; that every precaution has been taken to make it a foolproof ride as far as safety is concerned; that no instructions to a passenger as to the manner of riding the device are necessary; that there are 175 Loop-O-Planes in use in the United States and that this is the first accident of which he has any knowledge.

After hearing the foregoing testimony, the district judge felt that it might be helpful to him in deciding the case to have a demonstration of the operation of the machine made in his presence. Such a demonstration was accordingly arranged by the defendants and made in the presence of all parties including Walter B. Moses, a consulting engineer employed by the plaintiff. At the demonstration, it was shown by the defendants that, when the cars are loaded with passengers, it is practically impossible for the operator of the device to cause any unusual jolts by use of the brake or by reversing the motor. In his reasons for judgment, the judge makes the following observations: "This demonstration showed that with six persons in the car it was impossible to stop the device so as to result in a sudden or severe jolt. Only when the cars were empty and only by the expert engineer for the plaintiff exerting the strongest pressure in a position different from the position occupied by the operator, could he slow down the cars so as to result in a slight jolt. The court did observe, however, that there was some motion of the body and head of the passengers during the operation of the device."

After considering all of the evidence in the case, our brother below was of the opinion that the injuries suffered by the plaintiff resulted from a normal and usual operation of the Loop-O-Plane; that the defendants were without negligence and that they were therefore not to blame for the unfortunate accident. In resolving thus, he expressed the view that the accident was one which could have probably happened without any unusual jolting of the cars during the ride, since the medical evidence in the case revealed that fractures of the type sustained by the plaintiff are not infrequently attributable to sneezing, to a sudden turning of the head or to any movement of the body which would bring tension upon the bones of the neck.

372

A careful review of the law and facts of the matter has been ample to convince us that the conclusions reached by the district judge are correct.

█ The law of the case cannot be seriously disputed. A proprietor of a place of public amusement is not an insurer of the safety of his patrons, but he owes to them only what, under the particular circumstances, is ordinary or reasonable care. See Sistrunk v. Audubon Park Natatorium, La.App., 164 So. 667, 669, where the jurisprudence applicable in this type of case is discussed in detail and the authorities cited in the note contained in 98 A.L.R. 557. In 26 Ruling Case Law 714, the general rule of law to be invoked in these cases is stated as follows: "Though there are decisions to the effect that the proprietor of a scenic railway in an amusement park should be held to the same degree of care as is required of a common carrier, i. e., the highest degree of care and caution consistent with the practical operation of the railway, it is the well settled general rule that the proprietor of a place of amusement is not an insurer of the safety of his patrons, nor is his undertaking so similar to that of a common carrier of passengers as to call for the application of the same rule of responsibility. He is bound to exercise only the degree of care that would be expected of an ordinarily careful and prudent person in his position, and his duty is fulfilled when he makes the place as little dangerous as such a place can reasonably be made, having regard to the contrivances necessarily used in conducting such a place."

Applying the foregoing jurisprudence to the facts of the case, it will be at once seen that the only question involved here is whether the defendants' employee negligently operated the Loop-O-Plane in such a fashion as to cause the car in which the plaintiff was riding to be jolted or jerked suddenly and unusually.

█ The evidence of the defendants to the effect that the device is not dangerous per se and that it was in excellent mechanical condition at the time of the accident is not seriously contested by the plaintiff. She maintains, however, that she and her witnesses have shown by positive evidence that there was an unusual jolt or jerk in the operation of the machine and that this jolt caused the accident. On the other hand, the defendants' evidence proves to our satisfaction that the construction of the device is such as to preclude the possibility of any unusual jerking or jolting of the cars while the machine is in operation and we feel that the unfortunate accident is attributable to the fact that the bones in plaintiff's neck were not strong enough to withstand the usual jolts caused by the ordinary operation of the machine. It seems certain that the operator of the device was, as a prudent man, unable to foresee (as was the plaintiff) that a normal ride on the Loop-O-Plane would result in the deplorable injury. To hold otherwise would be to declare that the defendants were the insurers of plaintiff's safety.

Being of the opinion that the defendants are without fault in the premises, the judgment appealed from is affirmed.

Affirmed.